## UNITED STATES BANKRUPTCY COURT
## FOR THE
## DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**SAWTELLE BROTHERS INDUSTRIES, INC.,**          Chapter 7
    Debtor                                         Case No. 05-30233-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

**STEWART F. GROSSMAN,**
**CHAPTER 7 TRUSTEE,**

      **Plaintiff**

v.                                                      Adv. P. No. 06-1227

**CHESTER M. SAWTELLE and**
**EASTERN BANK, TRUSTEE, under Stock**
**Purchase Agreement dated August 27, 1981,**
**as amended,**

      **Defendant**
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

### MEMORANDUM

## I. INTRODUCTION

The matter before the Court is "Plaintiff's Motion for Partial Summary Judgment"

(the "Motion") filed by Stewart F. Grossman, as Chapter 7 trustee (the "Trustee") of

Sawtelle Brothers Industries, Inc. (the "Debtor"), on May 31, 2007 in connection with the

Complaint filed by him against Chester M. Sawtelle ("Mr. Sawtelle"), the now deceased

1

sole preferred stockholder of the Debtor, and Eastern Bank ("Eastern") in its capacity as a successor trustee under a certain Stock Purchase Agreement dated August 27, 1981 and later amended on May 24, 1991.

The Complaint contains twelve counts as follows: (1) Count I entitled "Turnover Against Eastern Bank-Bankruptcy Code § 542;" (2) Count II entitled "Avoidance of Lien Against Mr. Sawtelle-Bankruptcy Code § 544;" (3) Count III entitled "Determination of Secured Status Against Mr. Sawtelle-Bankruptcy Code § 506;" (4) Count IV entitled "Fraudulent Transfer Against Mr. Sawtelle-Bankruptcy Code § 548;" (5) Count V entitled "Fraudulent Transfer Against Mr. Sawtelle-Bankruptcy Code § 544(b);" (6) Count VI entitled "Recovery of Fraudulent Transfers Against Mr. Sawtelle -Bankruptcy Code § 550;" (7) Count VII entitled "Declaratory Judgment Against Mr. Sawtelle and Eastern Bank-23 U.S.C. § 2201;" (8) Count VIII entitled "Declaratory Judgment Against Mr. Sawtelle and Eastern Bank-28 U.S.C. § 2201;" (9) Count IX entitled "Declaratory Judgment Against Mr. Sawtelle-28 U.S.C. § 2201;" (10) Count X entitled "Declaratory Judgment Against Eastern Bank-28 U.S.C. § 2201;" (11) Count XI entitled "Declaratory Judgment Against Eastern Bank-28 U.S.C. § 2201;"[1] and (12) Count XII entitled "Declaratory Judgment Against Mr. Sawtelle-28 U.S.C. § 2201."

Through his Motion, the Trustee seeks summary judgment on Counts I through IV and VII through XII and on a counterclaim filed by Eastern. In support of his Motion, the

---

[1] The relief requested by the Trustee in the identically captioned Counts X and XI is discussed below.

Trustee filed a Statement of Undisputed Facts, to which neither defendant filed a substantive objection, and the affidavits of Craig Jalbert (the "Jalbert Affidavit"), the Trustee's accountant, and Pamela A. Harbeson, counsel to the Trustee.  Mr. Sawtelle died on June 16, 2007,[2] following the filing of the Complaint,[3] and his probate estate (the "Sawtelle Estate") filed an objection to the Motion, supported by the Affidavit of Stephen W. Howe (the "Howe Affidavit").[4]  The Court heard the Motion and the objection on January 15, 2008. Eastern did not file an objection to the Motion.  Nevertheless, it appeared at the January 15th hearing.  Based upon the pleadings, affidavits, and the Trustee's Statement of Undisputed Facts, to which no party substantively objected, the Court now makes the following findings of fact and rulings of law pursuant to Fed. R. Bankr. P. 7052.

## II. FACTS

On August 27, 1981 the Debtor executed a Stock Purchase Agreement with its then stockholders, Mr. Sawtelle, M. Francis Higgins, and Joel McKoan, as well as EssexBank, as trustee, with respect to certain life insurance policies on the lives of the stockholders. The parties amended the agreement by an "Amendment Agreement" dated May 24, 1991 (the

---

[2] *See* "Motion of Counsel to Defendant, Chester M. Sawtelle, for Extension of Time to File Response for Motion of Summary Judgment, for Continuance of Hearing Thereon and Request for Expedited Consideration" filed on July 11, 2007.

[3] The Trustee has not amended the Complaint to substitute Mr. Sawtelle's estate as a defendant. In all instances where the Trustee requests entry of summary judgment against Mr. Sawtelle, it is presumed that the correct party in interest is the Sawtelle Estate.

[4] Beginning in 1991, Mr. Howe was the personal lawyer to Mr. Sawtelle.  He now serves as a co-executer of the Sawtelle Estate.

"1991 Amendment") by and among the Debtor, Sawtelle Brothers, Inc., the Debtor's

subsidiary ("Brothers"), the surviving stockholders of the Debtor, Mr. Sawtelle and M.

Francis Higgins,[5] as well as Eastern which replaced EssexBank as trustee (as amended, the

"Agreement"). The Agreement imposed certain restrictions on the transfer of shares of the

Debtor's stock and provided for disposition of the shares upon the death of a stockholder.

The Agreement created a trust under which Eastern, as trustee, nominally owned,

maintained and administered certain life insurance policies on the lives of the stockholders,

the premiums of which were to be paid by the Debtor.[6] The cash surrender or death benefit

value of the policies was to be used to fund the Debtor's redemption of the stockholders'

equity in the event a stockholder died or, pursuant to a right of first refusal, wished to

transfer his shares to a third party during his lifetime. No separate trust document exists

regarding Eastern's rights and duties as a trustee with respect to the life insurance policies,

and the Agreement, as amended, represents the entire understanding among the parties

regarding the subject matter. The pertinent provisions of the Agreement are as follows:

<div align="center">

Section 4.    <u>Purchase of Stock in Event of Death</u>

</div>

> In the event of the death of a Stockholder during the term of this
> Agreement, the [Debtor] shall be obligated to purchase and the legal
> representatives of the estate of such deceased Stockholder shall be obligated
> to sell, all of the Stock owned by such Decedent on the Applicable Date. The
> purchase price for each share of Stock so purchased shall be determined as

---

[5] Joel McKoan died some time between 1981 and 1991 and was not a party to the 1991 Amendment.

[6] As discussed below, the Debtor did not directly fund the premium payments.

<div align="center">

4

</div>

provided in Article 5 of this Agreement.[7]

### Section 5.   Purchase Price

(b) [T]he purchase price of each share of preferred stock so purchased shall be its par value.

### Section 7.   Payment of Purchase Price

(a) The payment of the purchase price due to the Selling Stockholder shall be made as follows: ... (ii) If the sale is pursuant to Article 4 [a purchase in the event of the death of the Stockholder] of this Agreement, an aggregate amount equal to the sum of (A) the proceeds of any Life Insurance [as defined in Article 8] received by [Eastern] by reasons of the Decedant's [sic] death and (B) the Side Fund [as defined in Article 8] principal balance respecting such Stockholder, or an amount equal to the total purchase price, whichever is smaller shall be paid by [Eastern] at the closing . . . The [Debtor] shall be discharged from its obligations hereunder to the extent of said payment made by [Eastern].

### Section 8.   Insurance

(a) *In order to fund its obligations hereunder, the Corporation shall,* to the extent such obligations exceed $10,000.00 respecting any Stockholder, *enable* [Eastern] to acquire and maintain in force a policy or policies of life insurance (the "Life Insurance") on each such Stockholder ... Such policies shall be maintained in such amounts that the net death benefits payable upon the death of the insured Stockh older when combined with the Side Fund principal balance respecting such Stockholder, shall equal or exceed the then purchase price hereunder applicable to his shares. (emphasis supplied).
(i) Additional policies of Life Insurance *at the direction of the [Debtor,]* shall be applied for by [Eastern] when required hereunder on the Stockholders.
(ii) As to each policy of Life Insurance, the [Debtor] and [Eastern] shall take necessary steps to:

---

[7] The provisions of Section 4 of the Agreement were amended by the 1991 Amendment such that a death-time redemption would only be applicable to shares of the Debtor's preferred stock issued and outstanding as of the date of the 1991 Amendment, and would not apply to shares of the Debtor's common stock.

    A.     Vest all right, title and interest therein in [Eastern]; and

    B.     Designate [Eastern] as the sole payee of any benefits thereunder; and

    C.     Make the policy irrevocably non-assignable and non-transferable to any person, firm or corporation other than the insured.

(c) The [Debtor] agrees to pay when due all premiums on Life Insurance policies taken out pursuant to this Agreement and interest on all outstanding policy loans . . . .

(d) In the event that the [Debtor] directs [Eastern] to purchase additional Life Insurance on any Stockholder, each Stockholder hereby agrees to co-operate fully by performing all the requirements of the insurer which are necessary conditions preceding the issuance of the insurance policies. . . .

(e) [I]f this Agreement terminates before the death of a Stockholder, then such Stockholder shall have the option to purchase any policy or policies of Life Insurance owned by [Eastern], from [Eastern], for the price and upon the terms and conditions hereinafter set forth.

    (i) The option to purchase such policy or policies shall be exercisable within a period of thirty (30) days following the termination of this Agreement, but not later than any closing at which such Stockholder is to sell or dispose of all of his shares in the [Debtor].

    (ii) If such Stockholder desires to exercise his option to purchase the Life Insurance, he shall give written notice to the [Debtor], prior to the expiration of the option period, of his intention to exercise the option.

    (iii) The price which the Stockholder exercising the option shall pay to purchase the Life Insurance policy or policies shall be the difference between:

    A. The sum of:

        (I) the cash surrender value thereof, if any, on the date of the closing…, plus

        (II) The pro rata portion of any premium paid prior to such date which covers a period extending beyond such date; plus

        (III) Any dividend or dividend accumulations.

    B. Less the amount of any policy loan and interest thereon then accrued.

    (iv) Upon payment of the purchase price to [Eastern], [Eastern] shall deliver to the Stockholder the Life Insurance policy or policies with instruments of assignment…sufficient to transfer ownership of the said policy or policies to the Stockholder, *and pay to the [Debtor] the proceeds*

*received from the Stockholder.* (emphasis added).

Section 9.    Powers and Duties of [Eastern]

[Eastern] shall:
(a) Be entitled to reasonable compensation for its services, which shall be paid for by the [Debtor].
(b) Use its best efforts to collect any sums due or owing under the policies of Life Insurance.
(c) Have no responsibility as to payment of the premiums on the Life Insurance Policies and interest on policy loans, other than furnishing the [Debtor] with notice of premiums . . . .
(d) Not be required to take any steps or institute any proceedings unless and until properly reimbursed and protected against liability. . . .
(h) Be reimbursed for all reasonable expenses, disbursements and advances, including attorney fees, incurred or made by it in performance of its duties hereunder. . . .

Section 10.    Removal or Resignation of [Eastern]

The [Debtor], acting though its Board of Directors, shall have the right and authority to remove [Eastern] and appoint a successor Trustee.[8]

Section 20.    Termination of Agreement

This agreement shall terminate upon the first to occur or any of the following events:
(a) The adjudication of the [Debtor] as a bankrupt … .
(b) The voluntary or involuntary complete liquidation or dissolution of the [Debtor].
(c) This Agreement shall terminate and be void and of no effect ninety-nine (99) days after there shall remain only one surviving Stockholder hereunder.

The Agreement contains no specific provisions directing Eastern to deliver the

Policies to the Debtor or any other party or to otherwise wind up the affairs of the trust

---

[8] This provision was added by Section 5(f) of the 1991 Amendment and replaced the previous Section 10 of the original 1981 agreement which allowed removal of the trustee by a majority in interest of the Debtor's stockholders.

upon termination of the Agreement. Pursuant to Section 8(c) above, the Debtor was

obligated to pay all premiums for the life insurance policies. In practice, however, the

premiums were paid by Brothers directly with the liability recorded as loans against the

Debtor, or loans were made by Brothers to the Debtor who then made the payments

directly. Sometimes premiums were paid by automatic loans taken by the issuing

insurance companies against the cash value of the life insurance policies. As set forth in

the Jalbert Affidavit, the Debtor was insolvent on and after October 31, 2001, and it

experienced increased levels of insolvency from 2001 through 2003 primarily because of

the payment of premiums by Brothers on the Debtor's behalf. Jalbert Affidavit at ¶10.

On October 4, 2005, Brothers filed a voluntary petition under Chapter 7 of the

Bankruptcy Code, and Stewart F. Grossman was appointed the Chapter 7 trustee. In his

capacity as Chapter 7 trustee of Brothers, Mr. Grossman filed an involuntary petition under

Chapter 7 of the Bankruptcy Code against the Debtor on December 16, 2005.[9] On the

Debtor's petition date, Mr. Sawtelle was the sole preferred stockholder of the Debtor,

holding 881,999 shares of preferred stock with a per share par value of $0.55. The Court

entered an order for relief in the Debtor's case on February 9, 2006, and Mr. Grossman was

appointed the Chapter 7 trustee of the Debtor on February 14, 2006.

Pursuant to Section 20(a) of the Agreement, the "adjudication of the [Debtor] as a

---

[9] Mr. Grossman, as the Chapter 7 trustee of Brothers, timely filed a proof of claim in the Debtor's case asserting an unsecured nonpriority claim of $1.8 million for intercompany debt, which includes premiums paid by Brothers for the life insurance policies.

8

bankrupt" effected a termination of the Agreement.[10]  On February 14, 2006, the Trustee

notified Mr. Sawtelle by letter of the purported termination of the Agreement, and of his

option to purchase the insurance policies on his life under Section 8(e)(i) of the Agreement

during the thirty day period following termination.[11]  On the same day, the Trustee also

notified Eastern of the termination of the Agreement. Mr. Sawtelle declined to exercise any

right to purchase the policies.   Thereafter, the Trustee requested Eastern to close all

accounts maintained for the Debtor and turn the proceeds over to him which Eastern

refused to do.

The Trustee filed the Complaint against Mr. Sawtelle and Eastern on April 13, 2005

seeking, among other things, turnover of the insurance policies from Eastern as property

of the Debtor's estate. Mr. Sawtelle filed an answer on May 15, 2006, and, on the same day,

Eastern filed an answer and a counterclaim (the "Counterclaim") seeking a declaratory

judgment stating its view of the proper liquidation and distribution of the insurance

policies after payment of its reasonable costs. The Trustee filed the instant Motion on May

31, 2007.   Mr. Sawtelle filed a proof of claim on June 9, 2006 asserting an unsecured

nonpriority claim in the amount of $485,099.45 for "funds due pursuant to Stock Purchase

Agreement." One week later, Mr. Sawtelle died. According to the Trustee, the net cash

surrender value of the insurance policies on Mr. Sawtelle's life, as of the filing of the

---

[10] The effect of that provision is discussed below.

[11] The letter, although referenced as an exhibit to the Complaint, was not
attached thereto.

Motion, was $428,789.21 and the net death benefit value was $606,472.26. Additionally, as of December 2006, there was approximately $45,460 in a "Side Fund," as defined in the Section 8 of Agreement, and other associated bank and brokerage accounts maintained in connection the life insurance policies (collectively, the "Policies").

Due to Mr. Sawtelle's death, the Motion was not heard by the Court until January 15, 2008. Only the Sawtelle Estate filed a written objection to the Motion, supported by the Howe Affidavit, although Eastern did appear at the hearing to contest the Motion. At the hearing, the Court inquired of the parties whether the Trustee's attempted termination of the Agreement on February 14, 2006 violated 11 U.S.C. § 365(e)[12] which invalidates contractual provisions that purport to terminate contract rights in the event of a bankruptcy. No party responded with a position with respect to that issue, and no party

---

[12] The statute provides, in relevant part:

(e)(1) Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on--
    (A) the insolvency or financial condition of the debtor at any time before the closing of the case;
    (B) the commencement of a case under this title; or
    (C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

11 U.S.C. § 365(e)(1).

filed any subsequent memoranda to address it.  Nevertheless, counsel to the Sawtelle Estate agreed at the hearing that the Agreement had terminated by its terms.[13]

## III. POSITIONS OF THE PARTIES

The Trustee contends that he validly terminated the Agreement pursuant to Section 20 upon the Court's entry of the order for relief in the Debtor's case and that he duly notified Mr. Sawtelle of his option to purchase the Policies for their adjusted cash surrender value pursuant to Section 8(e) which he declined to exercise.  The language of Section 8(e), the Trustee argues, "clearly demonstrates the intent of the parties that, upon termination of the [Agreement], the trust was to terminate and the cash surrender value of the [Policies] was to be paid to the Debtor, either by [Mr. Sawtelle's] exercise of his option to purchase or by the Debtor terminating the policies itself."    Trustee's brief at p. 7.  The Trustee further asserts that the Policies inure to the benefit of the Debtor's estate and are not subject to any claims by either Eastern or the Sawtelle Estate.

The Sawtelle Estate and Eastern argue that the nature of the Agreement, with the Policies titled in the name of a third party and the absence of any specific instructions in the Agreement directing Eastern to deliver the Policies to the Debtor upon termination,

---

[13] Presumably, this position is based upon Section 20(c) of the Agreement which provides for termination of the Agreement "ninety-nine (99) days after there shall remain only one surviving Stockholder hereunder."  Assuming that the Trustee's purported termination on February 14, 2006 was invalid under § 365(e), that Mr. Higgins was alive throughout 2007, and that there was no intervening rejection of the Agreement as an executory contract under 11 U.S.C. § 365(d)(1), as discussed below, the Agreement would have terminated by its terms on September 23, 2007, 99 days after Mr. Sawtelle's death.

reflects the parties' original intention that the Sawtelle Estate was to be the true beneficiary of the trust and that the Debtor was to have only remainder interest in the Policies. Howe, in his Affidavit, states:

> It is my belief that the intent of the . . . Agreement was in order to protect the value of [Mr. Sawtelle's] shares of preferred stock, as of the date of the Agreement . . . to provide for a fund from which payments would be made and to insulate and secure that fund from creditors of the Debtor or any third party prior to the date of his death. I further understand after the payment to Mr. Sawtelle of the value of his stock that any remaining funds should be paid to the Debtor.

Howe Affidavit at paragraph 5.

Counsel for Eastern stated his view of the Agreement's purpose at the hearing:

> [W]hen you see a corporation and its shareholders set up a trusteed [sic] stock purchase agreement, taking the assets off the balance sheet of the corporation - - taking the insurance policies and putting them in a separate trust, they don't intend to have the *res* of that trust subject to the claims of creditors of that corporation. The whole purpose [was] to avoid that result . . . .

Tr. at p. 24. Additionally, in its Counterclaim, Eastern states:

> The evident purpose of the [Agreement] was to provide [Mr. Sawtelle] with a market and fixed price for his preferred stock upon his death; . . . to insulate and secure that fund from creditors of the Debtor or any third party prior to his death, or subject it to the possibility of diversion from that purpose for any reason; and after the payment of such amounts to reimburse the Debtor from any surplus remaining . . . .

Consistent with this understanding, the defendants argue that the Sawtelle Estate is entitled to payment $485,099.45 from the Policies' proceeds, representing a purchase price of $.55 per share for Mr. Sawtelle's 881,999 shares of preferred stock, with any remainder to be paid to the Debtor's estate.

The defendants requested an evidentiary hearing to resolve what they perceive to

12

be factual issues, including the competing interpretations of the Agreement.

## IV. DISCUSSION

As noted above, the Trustee seeks summary judgment on Counts I through IV and VII through XII of his Complaint and with respect to the Counterclaim of Eastern. Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c), made applicable to this proceeding by Fed.R.Bankr.P. 7056. *See also* <u>Desmond v. Varrasso</u> <u>(In re Varrasso)</u>, 37 F.3d 760, 763 (1st Cir.1994)("It is apodictic that summary judgment should be bestowed only when no genuine issue of material fact exists and the movant has successfully demonstrated an entitlement to judgment as a matter of law.").

In Count I of the Complaint, entitled "Turnover Against Eastern Bank-Bankruptcy Code § 542," the Trustee seeks turnover of the Policies pursuant to 11 U.S.C. § 542 because they are property of the Debtor's estate under 11 U.S.C. § 541. The Trustee contends that "by operation of the termination of the [Agreement], the [Policies] are now property of the estate and Eastern Bank is obligated to turn them over to the Trustee pursuant to. . . § 542." Count I is premised upon the termination of the Agreement as of February 9, 2006 pursuant to Section 20(a), the propriety of which the Court called into question because of the *ipso facto* nature of that termination clause. Both the Trustee and the Sawtelle Estate however, agree that the Agreement has been terminated, and Eastern Bank also appears to agree, subject to receiving instructions from the Court regarding distribution of the

13

Policies.  No party addressed the issue of whether the Agreement was an executory

contract or whether it was deemed rejected by the Trustee sixty days following the Court's

entry of the order for relief pursuant to 11 U.S.C. § 365(d)(1).[14] Regardless of whether the

Agreement was terminated pursuant to some provision of Section 20 or deemed rejected

under § 365(d), there can be no dispute that it is no longer enforceable by its terms.  The

issue is simply whether the Policies are property of the Debtor's estate and, if so, whether

the Sawtelle Estate has any claim to them or against the bankruptcy estate.

The agreed facts establish that the parties intended to create an express trust

through the Agreement in which the corpus, the Policies, were held in the name of one

party, Eastern, as trustee on behalf of another.  *See* Russell v. Meyers, 316 Mass. 669, 672,

56 N.E.2d 604 (1944)("[W]hether a trust is created depends primarily upon the

manifestation by the parties of an intention to create a trust."); *see also* Cooney v. Montana,

347 Mass. 29, 35, 196 N.E.2d 202 (1964)(an express trust must "unequivocally show an

intention that the legal estate be vested in one person to be held in some manner or for

some purpose on behalf of another.").  There can be little dispute that the Debtor was the

---

[14] The statute provides:

(d)(1) In a case under chapter 7 of this title, if the trustee does not assume or
reject an executory contract or unexpired lease of residential real property or
of personal property of the debtor within 60 days after the order for relief, or
within such additional time as the court, for cause, within such 60-day period,
fixes, then such contract or lease is deemed rejected.

11 U.S.C. § 365(d)(1).

settlor of that trust, with the ultimate power to control the *res*. *See* Agreement at Section

7(a)(ii)(discharging the Debtor from its obligations to a deceased stockholder to the extent

of payments made to his estate by Eastern); Section 8(a)("In order to fund its obligations

hereunder, the [Debtor] *shall,* . . . *enable* [Eastern] to acquire and maintain . . .[the Policies.]"

(emphasis added); Section 8(c)(requiring the Debtor to pay all premiums for the Policies);

Section 8(d)(permitting the Debtor to direct Eastern to purchase additional life insurance

policies); Section 8(e)(granting a stockholder the option to purchase the Policies from the

Trustee for their adjusted cash surrender value with such payment to be remitted to the

Debtor by Eastern); and Section 10 (permitting the Debtor to remove Eastern as trustee and

appoint a successor trustee).

   As the court noted in <u>Aylward v. Landry (In re Landry)</u>, 226 B.R. 507, 510 (Bankr.

D. Mass.1998), the starting point for any analysis of whether a debtor's bankruptcy estate

has an interest in a trust that can be reached by a trustee is section 541(a) of the Bankruptcy

Code which provides that, except as provided in subsections 541(b) and (c)(2), a debtor's

bankruptcy estate is comprised of "all legal or equitable interests of the debtor in property

as of the commencement of the case. . . " 11 U.S.C. § 541(a)(1). The Supreme Court has

determined that the scope of section 541(a) is broad. *See* <u>United States v. Whiting Pools,

Inc.</u>, 462 U.S. 198, 204-05 & n. 9, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983).  In ascertaining the

existence and scope of a debtor's legal and equitable interest in property, the Court must

look to state law.  <u>Riley v. Tougas (In re Tougas)</u>, 338 B.R. 164, 173 (Bankr. D.

Mass.2006)(citing, *inter alia*, <u>Butner v. United States</u>, 440 U.S. 48, 54, 99 S.Ct. 914, 59 L.Ed.2d

136 (1979), and <u>Braunstein v. Beatrice (In re Beatrice)</u>, 277 B.R. 439 (Bankr. D. Mass.2002)

*aff'd*, 296 B.R. 576 (B.A.P. 1st Cir. 2003)). Pursuant to Massachusetts law, "[w]hen a trust

instrument addresses only the transfer of income, and makes no provision for the principal,

the disposition of the principal must be determined, if at all possible, from the intent of the

settlor." <u>Ventura v. Ventura</u>, 407 Mass. 724, 730, 555 N.E.2d 872 (Mass. 1990)(quoting

<u>Goodwin v. New England Trust Co.</u>, 321 Mass. 502, 504, 73 N.E.2d 890 (1947)). Thus, the

Court must examine the provisions of the Agreement to determine if that intent is readily

apparent or if an evidentiary hearing is required.

While the Agreement contains no specific directive for Eastern to return the Policies

to the Debtor upon termination, the absence of such a directive does not undermine the

existing language of the Agreement which sufficiently manifests the parties' original

intention that the value of the Policies was to inure to the Debtor. Despite the fact that the

Policies were owned in the name of Eastern and that Eastern was designated as the sole

payee of the benefits under the Policies, the powers and obligations vested in the Debtor

under the Agreement compel the conclusion that Debtor retained traditional incidents of

ownership and beneficial interests in them. First, the Debtor had the contractual obligation

to pay all premiums. Indeed, the unrebutted Jalbert Affidavit establishes that the Debtor's

liability to Brothers for its payment of the Policies' premiums was a primary cause of the

increase in the Debtor's levels of insolvency in the years 2001 through 2003. Jalbert

Affidavit at ¶ 10. Second, the Debtor had the obligation to pay Eastern for its services, had

the ability to direct Eastern to purchase additional insurance policies and had the unilateral

right to remove and replace Eastern as trustee under the Agreement. The Debtor expended

substantial sums to fund this arrangement which it could effectively recoup either through

its receipt of the Policies' adjusted cash surrender value from Mr. Sawtelle during his life,

*see* Section 8(e), or through receipt of his shareholder equity upon his death, *see* Sections 4,

6, 7 and 8. Because the Debtor was the ultimate beneficiary of the Policies, the Court

concludes that they are property of its estate. *See also* In re Cooperativa Cafeteros de P.R.,

37 B.R. 952, 955 (D.P.R. 1984)("A life insurance policy carried by the bankrupt corporation

upon the life of . . . [a] large stockholder, at the expense of a corporation, passes to the

trustee as an asset of the estate."); In re McCulloch & Son, Inc., 30 B.R. 7, 8 (Bankr. D. Or.

1983)("Where the bankrupt, by virtue of paying premiums, is both the owner of a life

insurance policy on another and is the beneficiary of the policy, the insurance policy is

property of the estate even though the policy has not matured, has no cash surrender

value, and is otherwise contingent.")(citing Mutual Trust Life Ins. Co. v. Wemyss, 309

F.Supp. 1221, 1228 (D. Me, 1970)). For the above reasons, the Court finds that the Policies

are property of the Debtor's estate under 11 U.S.C. § 541(a).

Eastern's argument that it was the parties' intention to insulate the Policies from the

Debtor's creditors for the benefit of Mr. Sawtelle does not affect the bankruptcy estate's

property interest. While the Agreement reflects an intention of the parties that the Sawtelle

Estate would receive a fixed sum from the Policies' proceeds upon Mr. Sawtelle's death,

such an intention would have to have been conditioned upon the solvency of the Debtor

at the time of transfer. The intervening bankruptcy of the Debtor, applicable state law and

the unambiguous terms of the Agreement prevent Mr. Sawtelle's Estate from receiving

over $485,000 for his stock in a bankrupt and defunct corporation at the fixed price he

originally bargained for in the Agreement. Any such arrangement in the current context

of a bankruptcy proceeding would be invalid as a fraudulent transfer, *see* 11 U.S.C. § 548,

potentially subordinated under 11 U.S.C. § 510(b) and impermissible under Massachusetts

state law.[15] *See* Mass. Gen. Laws ch. 156B §§ 45[16] and 61 (imposing liability upon

stockholders and directors for redemptions made when a corporation is insolvent or which

render a corporation insolvent).

The Sawtelle Estate has provided no basis to assert a secured claim against the

Policies as it did not produce any evidence of a perfected security interest in them. Indeed,

Mr. Sawtelle filed a proof of claim asserting a nonpriority *unsecured* claim which, to date,

has not been amended. The Sawtelle Estate has not articulated any basis for the imposition

---

[15] The Complaint contains a count for fraudulent transfer but does not contain one for subordination under § 510(b), although the Trustee did raise the issue in his brief and at the January 15, 2008 hearing.

[16] The statute provides, in relevant part:

Stockholders to whom a corporation makes any distribution, whether by way of dividend, repurchase or *redemption* of stock, or otherwise, except a distribution of stock of the corporation, if the corporation is, or is thereby rendered, insolvent shall be liable to the corporation for the amount of such distribution made, or for the amount of such distribution which exceeds that which could have been made without rendering the corporation insolvent, but in either event, only to the extent of the amount paid or distributed to them respectively . . . .

Mass. Gen Laws ch. 156B § 45. (emphasis added).

18

of an equitable lien on the Policies. In short, the Sawtelle Estate has, at most, a rejection

claim under 11 U.S.C. § 502(g) or a general unsecured claim against the Debtor's estate, a

claim which may be subject to mandatory subordination under 11 U.S.C. § 510(b).[17] *See*

*generally* <u>Baroda Hill Investments, Ltd. v. Telegroup, Inc. (In re Telegroup, Inc.)</u>, 281 F.3d

133, 138 (3rd Cir. 2002)(a claim "arises from" the purchase or sale of a security if there is

a nexus or causal relationship between the claim and the sale of the security); <u>In re Enron</u>

<u>Corp.</u>, 341 B.R. 141, 163 (Bankr. S.D.N.Y. 2006)(subordinating claims arising from

ownership of employee stock options; concluding "the broad applica[tion] of section 510(b)

is now quite settled.").

    The Court finds that the language of the Agreement is unambiguous, there are no

genuine issues of material fact concerning the parties' intent thereunder and that the

Trustee is entitled to judgment as a matter of law. The Policies are property of the Debtor's

estate and, as such, they are required to be turned over by Eastern to the Trustee. The

Court grants the Motion with respect to Count I of the Complaint. The Court also notes

---

[17] The statute provides, in relevant part:

> (b) For the purpose of distribution under this title, a claim *arising from*
> rescission of a purchase or sale of a security of the debtor or of an affiliate of
> the debtor, for damages arising from the purchase or sale of such a security,
> or for reimbursement or contribution allowed under section 502 on account
> of such a claim, shall be subordinated to all claims or interests that are senior
> to or equal the claim or interest represented by such security, except that if
> such security is common stock, such claim has the same priority as common
> stock.

11 U.S.C. § 510(b). (emphasis added).

that, notwithstanding the above analysis, the Motion is also properly allowed in light of

Eastern's failure to submit any written objection to the Motion or any counter-affidavits to

create genuine issues of material fact required by Fed. R. Civ. P. 56(e), made applicable to

this proceeding by Fed. R. Bankr. P. 7056. Moreover, the Howe Affidavit, which was

introduced by the Sawtelle Estate,[18] is not based on Howe's personal knowledge of the

parties' original intent regarding the Agreement and is not otherwise sufficient to establish

the existence of a genuine issue of material fact with respect to Count I.

In Count II of the Complaint, entitled "Avoidance of Lien Against Mr. Sawtelle-

Bankruptcy Code § 544," the Trustee alleges that Mr. Sawtelle asserts a lien on the Policies

but has failed to provide the Trustee with any evidence of such lien's validity, amount or

perfection. The Trustee contends that any such lien is voidable under 11 U.S.C. § 544(a).

As discussed above, neither Mr. Sawtelle nor his estate filed a secured proof of claim in this

case, and they have presented no evidence of secured status. Moreover, the Sawtelle Estate

asserts no opposition to the entry of summary judgment on this Count in its Memorandum

of Law. Accordingly, the Trustee's Motion with respect to Count II is allowed.

In Count III of the Complaint entitled "Determination of Secured Status Against Mr.

Sawtelle-Bankruptcy Code § 506," the Trustee asserts that the value of any secured claim

of Mr. Sawtelle in the Policies is zero. For the reasons stated above with respect to Counts

I and II, the Trustee's Motion with respect to Count III is allowed.

---

[18] Through Count I, the Trustee seeks relief against Eastern, not the Sawtelle
Estate.

In Count IV of the Complaint entitled "Fraudulent Transfer Against Mr. Sawtelle-Bankruptcy Code § 548," the Trustee alleges that the Debtor has been insolvent since December 16, 2001,[19] and that he may avoid the transfer of premium payments for the benefit of Mr. Sawtell while the Debtor was insolvent. This Count is now moot in light of the Court's finding on Count I.

In Count VII of the Complaint entitled "Declaratory Judgment Against Mr. Sawtelle and Eastern Bank-28 U.S.C. § 2201," the Trustee seeks a declaratory judgment that on February 9, 2006, the date the Court entered the order for relief in the Debtor's case, the trust terminated. As discussed above regarding Count I, a legal issue exists concerning whether the purported termination of the Agreement by the Trustee by letter dated February 14, 2006 pursuant to Section 20(a) of the Agreement violated 11 U.S.C. § 365(e)(1). The Trustee did not seek leave to brief the matter. Accordingly, the Trustee has not demonstrated entitlement to summary judgment on Count VII as a matter of law. The Motion is denied with respect to Count VII.

In Count VIII of the Complaint entitled "Declaratory Judgment Against Mr. Sawtelle and Eastern Bank-28 U.S.C. § 2201," the Trustee seeks a declaratory judgment that, as of the petition date, the owner and beneficiary of the Policies was the Trustee. For the reasons stated regarding Count I above, the Motion is allowed with respect to Count VIII.

In Count IX of the Complaint entitled "Declaratory Judgment Against Mr. Sawtelle-28 U.S.C. § 2201," the Trustee seeks a declaratory judgment that Mr. Sawtelle has no

---

[19] According to the Jalbert Affidavit, the date of insolvency was October 31, 2001

21

interest in the Policies.  For the reasons stated regarding Count I and II above, the Motion is allowed with respect to Count IX.

In Count X of the Complaint entitled "Declaratory Judgment Against Eastern Bank 28 U.S.C. § 2201," the Trustee seeks a declaratory judgment that Eastern has no interest in the Policies or their proceeds.  For the reasons stated above regarding Count I, the Motion is allowed with respect to Count X insofar as Eastern seeks an interest in the Policies pursuant to the terms of the Agreement.[20]

In Count XI of the Complaint entitled "Declaratory Judgment Against Eastern Bank 28 U.S.C. § 2201," the Trustee seeks a declaratory judgment that: (i) at all relevant times, Eastern held the Policies in a resulting trust for the benefit of the Debtor; and (ii) as of February 9, 2006, the Policies became property of the Debtor's estate.  Having determined that the Policies are property of the Debtor's estate, the latter request for declaratory judgment is allowed for the reasons stated above.  The Motion is also allowed with respect to the first request.  "Generally speaking, it is presumed that when one party pays the purchase price of property, but title is placed in the name of another, the latter holds the property in a resulting trust for the payor. That is, the payor intended the benefit of the property to inure to him or her, not the title holder." Feinman v. Lombardo, 214 B.R. 260, 267 (D. Mass. 1997)(citing Robinson v. Robinson, 366 Mass. 582, 585, 321 N.E.2d 637 (1974); Frank v. Frank, 335 Mass. 130, 135, 138 N.E.2d 586 (1956); Ross v. Ross, 2 Mass. App. C.

---

[20] Eastern may have general claims against the Debtor's estate for fees owed to it under the Agreement.

502, 508, 314 N.E.2d 888 (1974)).  In this case, the Agreement unambiguously required the

Debtor to pay the premiums on the Policies and pay Eastern reasonable compensation for

its services as trustee.  Further, Eastern was "not . . . required to take any steps or institute

any proceedings unless and until properly reimbursed and protected against liability." *See*

Agreement at Section 9(d).   Eastern's role was administrative and subordinate to the will

and direction of the Debtor regarding all material issues concerning the Policies.  As such,

Eastern was a mere title holder, holding the Policies for the benefit of the Debtor.  The

Motion is allowed with respect to Count XI.

In Count XII of the Complaint entitled "Declaratory Judgment Against Mr. Sawtelle-

28 U.S.C. § 2201," the Trustee seeks a declaratory judgment that Mr. Sawtelle holds no

claim against the Debtor's estate but solely holds an equity interest in the Debtor which has

no value.  The Motion is denied with respect to Count XII as the Sawtelle Estate may have

a claim against the Debtor's estate for rejection of the Agreement under 11 U.S.C. § 502(g),[21]

or a general unsecured claim derivative of his stock ownership.

The Trustee also seeks summary judgment on Eastern's Counterclaim through

---

[21] The statute provides, in relevant part:

(g)(1) A claim arising from the rejection, under section 365 of this title or
under a plan under chapter 9, 11, 12, or 13 of this title, of an executory
contract or unexpired lease of the debtor that has not been assumed shall be
determined, and shall be allowed under subsection (a), (b), or (c) of this
section or disallowed under subsection (d) or (e) of this section, the same as
if such claim had arisen before the date of the filing of the petition.

11 U.S.C. § 502(g)(1).

which it requests:

> [A] declaratory judgment stating the proper liquidation and distribution of the Trust corpus, after payment of the reasonable costs of termination, among Chester M. Sawtelle preserving his interest as beneficiary of the Trust, and thereafter of the remainder to the Debtor's estate, in accordance with the terms of the Trust and applicable provisions of Massachusetts law, leading to the discharge of Eastern Bank's fiduciary duties under the Trust as a result thereof."

Because the Court has determined that the Policies are property of the Debtor's estate and that turnover of the Policies by Eastern to the Trustee is required under 11 U.S.C. § 542, the Court denies the relief requested in the Counterclaim. For that reason, and due to Eastern's failure to object to the Motion and otherwise file its own cross motion for summary judgment on the Counterclaim, the Motion is allowed regarding the Counterclaim. A separate order shall enter.

By the Court,

Dated: April 24 , 2008

Joan N. Feeney
United States Bankruptcy Judge